(Rev. 4/30/2014 Search Warrant)

FILED IN CHAMBERS
U.S.D.C ATLANTA

Date: Sep 12 2023

KEVIN P. WEIMER , Clerk

By: s/James Jarvis

Deputy Clerk

# United States District Court

Northern District of Georgia

In the Matter of the Search of:

**Information associated with the Apple iCloud Account Mordeau60@iCloud.com that is stored at premises owned, maintained, controlled, or operated by Apple Inc., a company headquartered at One Apple Park Way, Cupertino, CA 95014**

**APPLICATION & AFFIDAVIT FOR SEARCH WARRANT**

CASE NUMBER: 1:23-mc-1490

**UNDER SEAL**

I, Bruce J. Hernandez, being duly sworn, depose and say:

I am a(n) Special Agent of the DEA, and have reason to believe that, on the property or premises known as

**Information associated with the Apple iCloud Account Mordeau60@iCloud.com that is stored at premises owned, maintained, controlled, or operated by Apple Inc., a company headquartered at One Apple Park Way, Cupertino, CA 95014, as further described in Attachment A**

There is now concealed certain property, certain data, and certain information, namely,

**See Attachment B**

which constitutes evidence of the commission of a criminal offense and property which has been used as the means of committing a criminal offense, concerning violations of 21 U.S.C. §§ 841 and 846, and 18 U.S.C. §§ 1956 and 1957, over which the United States District Court for the Northern District of Georgia has jurisdiction. The facts to support a finding of Probable Cause are as follows:

## SEE ATTACHED AFFIDAVIT

Continued on the attached sheet and made a part hereof.

☒Yes ☐No

*Bruce J. Hernandez*

Signature of Affiant
Bruce J. Hernandez

Sworn to me by telephone pursuant to Federal Rule of Criminal Procedure 4.1.

| | |
|---|---|
| September 12, 2023 | at  Atlanta, Georgia |
| Date | City and State |

CHRISTOPHER C. BLY
UNITED STATES MAGISTRATE JUDGE

Name and Title of Judicial Officer

Signature of Judicial Officer

AUSA John DeGenova /404-581-6000 /

SW-123MC1490-000001

## <u>ATTACHMENT A</u>

### Property to Be Searched

This warrant applies to digital information associated with the Apple iCloud Account: **Mordeau60@iCloud.com ("Subject Account 1")** that is stored at premises owned, maintained, controlled, or operated by Apple Inc., a company headquartered at Apple Inc., One Apple Park Way, Cupertino, CA 95014.

1

# ATTACHMENT B

## Particular Things to be Seized

### I.   Information to be disclosed by Apple

To the extent that the information described in Attachment A is within the possession, custody, or control of Apple, including any messages, records, files, logs, or information that have been deleted but are still available to Apple, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Apple is required to disclose the following information to the government, in unencrypted form whenever available, for each account or identifier listed in Attachment A:

1. All records or other information regarding the identification of the account, to include full name, physical address, telephone numbers, email addresses (including primary, alternate, rescue, and notification email addresses, and verification information for each email address), the date on which the account was created, the length of service, the IP address used to register the account, account status, methods of connecting, and means and source of payment (including any credit or bank account numbers);

2. All records or other information regarding the devices associated with, or used in connection with, the account (including all current and past trusted or authorized iOS devices and computers, and any devices used to access Apple services), including serial numbers, Unique Device Identifiers ("UDID"), Advertising Identifiers ("IDFA"), Global Unique Identifiers ("GUID"), Media Access Control ("MAC") addresses, Integrated Circuit Card ID numbers ("ICCID"), Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifiers ("MEID"), Mobile Identification Numbers ("MIN"), Subscriber Identity Modules ("SIM"), Mobile

SW-123MC1490-000003

Subscriber Integrated Services Digital Network Numbers ("MSISDN"), International Mobile Subscriber Identities ("IMSI"), and International Mobile Station Equipment Identities ("IMEI");

3. The contents of all emails associated with the account, including stored or preserved copies of emails sent to and from the account (including all draft emails and deleted emails), the source and destination addresses associated with each email, the date and time at which each email was sent, the size and length of each email, and the true and accurate header information including the actual IP addresses of the sender and the recipient of the emails, and all attachments from November 1, 2022 to September 11, 2023;

4. The contents of all instant messages associated with the account, including stored or preserved copies of instant messages (including iMessages, SMS messages, and MMS messages) sent to and from the account (including all draft and deleted messages), the source and destination account or phone number associated with each instant message, the date and time at which each instant message was sent, the size and length of each instant message, the actual IP addresses of the sender and the recipient of each instant message, and the media, if any, attached to each instant message from November 1, 2022 to September 11, 2023;

5. The contents of all files and other records stored on iCloud, including all iOS device backups, all Apple and third-party app data, all files and other records related to iCloud Mail, iCloud Photo Sharing, My Photo Stream, iCloud Photo Library, iCloud Drive, iWorks (including Pages, Numbers, and Keynote), iCloud Tabs, and iCloud Keychain, and all address books, contact and buddy lists, notes, reminders, calendar

2

SW-123MC1490-000004

entries, images, videos, voicemails, device settings, and bookmarks from November 1, 2022 to September 11, 2023;

6. All activity, connection, and transactional logs for the account (with associated IP addresses including source port numbers), including FaceTime call invitation logs, mail logs, iCloud logs, iTunes Store and App Store logs (including purchases, downloads, and updates of Apple and third-party apps), messaging logs (including iMessage, SMS, and MMS messages), My Apple ID and iForgot logs, sign-on logs for all Apple services, Game Center logs, Find my iPhone logs, logs associated with iOS device activation and upgrades, and logs associated with web-based access of Apple services (including all associated identifiers) from November 1, 2022 to September 11, 2023;

7. All records and information regarding locations where the account was accessed, including all data stored in connection with Location Services from November 1, 2022 to September 11, 2023;

8. All records pertaining to the types of service used; and

9. All records pertaining to communications between Apple and any person regarding the account, including contacts with support services and records of actions taken from November 1, 2022 to September 11, 2023.

3

SW-123MC1490-000005

## II.     Information to be seized by the government

All information described above in Section I that constitutes contraband, fruits, evidence and/or instrumentalities of violations of Title 21, United States Code, Sections 841(a)(1) and 846 (Distribution of Controlled Substances and Conspiracy) and Title 18, United States Code, Sections 1956 and 1957 (Money Laundering and Conspiracy); involving Charles Anthony DUNN, Ernest DEAS, and their co-conspirators, from November 2, 2022 to September 11, 2023, including information pertaining to the following matters:

1. Any and all stored communications, including, voice calls, stored voice mail or other audio messages, text messages, email messages, chats, multimedia messages, and messages through other installed applications, or other electronic communications that evidence the transportation, ordering, distribution, possession and sale of controlled substances, the collection, transmission, or other use of drug proceeds, the laundering of suspected drug proceeds, the possession/use of firearms, and/or the connection to known and as yet unidentified co-conspirators;

2. Photographs, videos, records, other electronic media which show the transportation, ordering, distribution, possession and sale of controlled substances, the collection, transmission, or other use of drug proceeds, the laundering of drug proceeds or the collection, processing, and transmission of cash, the possession, acquisition, or use of firearms, and/or connection to known and as yet unidentified conspirators in the investigation;

4

3. Books, records, receipts, notes, correspondence, ledgers, and other documents and/or papers relating to ownership, residency, or use of any of vehicles and/or properties, including bills, photographs, and personal papers;

4. records of house, warehouse, or apartment leases, safety deposit boxes, or storage facilities;

5. records relating to the purchase of business or personal assets including property, vehicles, furniture, jewelry or any other items or receipts reflecting expenditures for personal or business items;

6. documents reflecting the use of fictitious names, addresses, and business fronts, the use of other people's names addresses and businesses, and the dominion and control over assets placed under someone else's name;

7. The identity of the person(s) who created or used the Apple ID, including records that help reveal the whereabouts of such person(s);

8. Evidence indicating how and when the account was accessed or used, to determine the chronological and geographic context of account access, use and events relating to the crime under investigation and the account subscriber;

9. Any records pertaining to the means and source of payment for services (including any credit card or bank account number or digital money transfer account information);

10. Evidence indicating the subscriber's state of mind as it relates to the crime under investigation;

11. Evidence that may identify any co-conspirators or aiders and abettors, including records that help reveal their whereabouts.

5

SW-123MC1490-000007

This warrant authorizes a review of electronically stored information, communications, other records and information disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the reviewing agency may deliver a complete copy of the disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

SW-123MC1490-000008

**AFFIDAVIT IN SUPPORT OF
AN APPLICATION FOR A SEARCH WARRANT**

I, Bruce Hernandez, depose and state under penalty of perjury:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I am an "investigative or law enforcement officer" of the United States, within the meaning of Section 2510(7) of Title 18, United States Code, that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Section 2516 of Title 18, United States Code.

2.      From 2011 to 2018, I was a police officer assigned to the narcotics section of the Largo (Florida) Police Department. From April 2014 to July 2018, I worked as a Task Force Officer for the DEA in Tampa Bay, Florida. I am now a Special Agent of the DEA, and am currently assigned to the Atlanta Field Division. I have been a Special Agent since October 2018. I received 16 weeks of training in drug investigations and related legal matters at the DEA Training Academy in Quantico, Virginia.

3.      Based upon my training, experience, and participation in other narcotics investigations, my accumulated knowledge from consultations with other law enforcement agents, and my debriefings of narcotics offenders, I know the following:

      a. Drug traffickers and those who launder the money generated by drug traffickers (money launderers) often cooperate and associate with a number of people involved in their illegal drug trafficking activity. As a result of the association and cooperation, the drug traffickers and money launderers often possess documents and other items that identify other members of a drug

1

SW-123MC1490-000009

trafficking organization. Drug traffickers commonly maintain addresses or telephone numbers of their criminal associates in phones, address books, journals, computer files or other types of papers, even if said items may be in code. Drug dealers keep such information readily available so that they may transact narcotics business quickly and, also, so that they may be in constant contact should questions or difficulties arise in the course of their illegal endeavors. Additionally, I know that the nature of the drug business frequently necessitates that a drug trafficker's criminal associates change locations and contact phone numbers. Therefore, in order to keep up with those associates, it is necessary to keep accurate records of each individual's contact phones and addresses.

b. With the advancement of technology, drug traffickers and money launderers commonly use multiple SIM cards, mobile or cellular telephones, smart phones (including Android and iOS-based devices), personal digital assistants, electronic address books and pagers, as well as regular telephones, to conduct their drug trafficking business. These items are often kept where traffickers have ready access to them, including on their person, in their vehicles, and in their residences. These devices commonly contain information related to the drug trafficking and money laundering activities, including telephone numbers of their criminal associates, voice and text or other electronic messages with their criminal associates, drug and money inventories and ledgers (including pay-owe ledgers), photographs, and other

SW-123MC1490-000010

valuable information. I know that the forensic examination of cellular telephones will often recover deleted information including contact names and numbers as well as deleted text messages.

c. Drug trafficking and money laundering on the scale revealed in this investigation are frequently a continuing activity that spans months or even years. Drug traffickers' inventory of controlled substances fluctuates depending on availability and demand. Drug traffickers commonly front drugs, or provide them on consignment to their customers. As a result, drug traffickers and money launderers must maintain books, receipts, notes, ledgers or some other type of record reflecting such transactions. Drug traffickers and money launderers usually keep their records in some secure yet readily accessible place where they can be used and maintained, such as in homes, storage buildings, automobiles, and safes. Drug traffickers and money launderers often keep these records of their illegal activities beyond the time during which controlled substances are actually in their possession, so that they can keep records of prior transactions for which they might be owed money for or owe money for.

d. Drug traffickers and money launderers use cell phones, computers, and other electronic media devices to communicate with co-conspirators (including, but not limited to, suppliers, couriers, stash house workers, and customers) coordinate the purchase/sale/distribution of narcotics. I know from my training and experience that drug traffickers also use "smartphones" for these

3

SW-123MC1490-000011

purposes, including various multimedia and communication platforms and applications. In particular, I know from my experience that drug traffickers often use messaging features on applications, including, but not limited to, Facebook Messenger, WhatsApp, Instagram, Telegram, WeChat, and various other chat features within other applications.

e.  Drug traffickers and money launderers will often subscribe to various communication services in alias names in an attempt to thwart law enforcement efforts to identify traffickers. Drug traffickers will often store their associates' contact information in phones and index such information to nicknames or other aliases instead of true name.

f.  Drug traffickers and money launderers often maintain some record of the movement of money, whether it is accomplished by wire or inter-bank transfer or by a person acting as a courier. Such records, even though they may be in code, are evidence of their illegal activities.

g.  Drug traffickers and money launderers often use false or fictitious names or corporations or other business entities to launder their drug proceeds and to send shipments of cash or controlled substances through the mail or other delivery services. Banks, both domestic and abroad, through which proceeds from their illegal activities are laundered, are often utilized by drug traffickers and money launderers or their agents. Funds are frequently transferred between banks and various accounts to conceal their sources and origins. It is also not uncommon for drug traffickers or money launderers to obtain

4

SW-123MC1490-000012

negotiable instruments. Documents or records of any kind reflecting any connection with any such entity or transaction constitute potential evidence that can be used against the drug trafficker or money launderer.

h.  Drug traffickers and money launderers frequently utilize a continuing pattern of activities to launder and conceal drug-generated proceeds and assets that lasts over a period of months or even years. Drug traffickers and money launderers use these patterns or schemes to create the appearance of legitimate income so that they can eventually convert the proceeds or assets to themselves or to a nominee under their control. In this way, the drug traffickers and money launderers can enjoy and use their properties while attempting to conceal their illegal activities, which generated the proceeds or assets.

i.  Drug traffickers and money launderers regularly pose for photographs while in possession of firearms, cash, and narcotics for posting on social media sites or for personal display in their residences.

**Sources of Information**

4.      I make this affidavit based upon personal knowledge derived from my training, experience, and participation in this investigation; information that I have learned from discussions with other investigators; the review of written reports of investigations, arrests, and seizures; the review of reports of physical surveillance conducted by state and

5

local officers or other federal agents; the review of telephone toll records; information from court-authorized intercepts; and debriefings of sources of information and other witnesses.

5.      All statements set forth herein are stated in substance, unless otherwise indicated by quotation marks. This affidavit references intercepted communications that took place primarily in English. These interpretations and transcriptions/translations are drafts and subject to revision. Additionally, I know that participants in criminal conspiracies often speak in code, which is subject to interpretation. So, wherever in this affidavit I state a belief, that belief is my interpretation of what was said in the communication. This belief is based upon my training, experience, and knowledge of this investigation.

6.      Because this affidavit is being submitted for the limited purpose of seeking authorization to search **Subject Account 1**, I have not set forth each and every fact learned during the course of the investigation. Facts not set forth herein are not being relied upon in reaching my conclusion that an order should be issued, nor do I request that the Court rely upon any facts not set forth herein in reviewing this affidavit.

## Probable Cause

7.      DEA Atlanta is currently investigating an Atlanta drug distribution ring centered around Charles DUNN. Agents have identified one of DUNN's associates, Adan MACEDO-RIOS, as a multi-kilogram cocaine and methamphetamine drug trafficker. Based on the investigation, agents have determined that MACEDO distributed cocaine and methamphetamine to other drug distributors, such as Charles DUNN, in Atlanta and other jurisdictions. Agents have intercepted wire and electronic communications over cellular devices used by MACEDO and DUNN, along with other conspirators, pursuant to federal

6

SW-123MC1490-000014

orders authorizing such interception.[1]

8.     As discussed below, agents identified the suspected user of **Subject Account 1**, Ernest DEAS, as another of DUNN's cocaine suppliers.

9.     During the investigation, agents, working with local law enforcement, arrested several of DUNN's cocaine transporters. For example, Marquis Smith was arrested on February 25, 2023, on Interstate 20 East in Covington, Georgia, which is in the Northern District of Georgia, with four kilograms of cocaine and a loaded handgun in his vehicle. Smith was conducting a drug transaction for DUNN and MACEDO.

10.     Second, on March 5, 2023, DUNN and MACEDO coordinated a four-

---

[1] There have been three periods of wiretap interception in this case. Agents first began intercepting communications over two phones used by MACEDO, assigned telephone numbers (470) 927-9767 (Target Telephone #1 or TT#1) and (678) 914-3630 (Target Telephone #2 or TT#2), and two phones used by DUNN, assigned telephone numbers (404) 452-2448 (Telephone #3 or TT#3) and (470) 526-4638, (Target Telephone #4 or TT#4), pursuant to a February 17, 2023 order from the Honorable Eleanor L. Ross, United States District Judge for the Northern District of Georgia (1:23-mj-170).

During the second interception period, pursuant to an April 6, 2023 order from the Honorable J.P. Boulee, United States District Judge for the Northern District of Georgia (1:23-mj-333), agents intercepted wire and electronic communications over DUNN's **TT#3** and another phone used by MACEDO: (463) 248-7054 (Target Telephone #5 (TT#5)), and intercepted wire communications over a phone used by Ignacio GUDINO: (818) 233-1099 (Target Telephone #6 (TT#6)).

Agents were intercepting wire and electronic communications over DUNN's **TT#3** and **TT#4**, pursuant to a June 16, 2023 order from the Honorable Steven D. Grimberg, United States District Judge for the Northern District of Georgia (1:23-mj-570). During that period of interception, on July 11, 2023, DUNN, MACEDO, and multiple other members of the DUNN DTMLO were arrested for federal drug crimes.

SW-123MC1490-000015

kilogram cocaine transaction, where Darrius ELLIOTT would retrieve four kilograms of cocaine from an unknown individual (UM197) in Lawrenceville, Georgia. ELLIOTT was also arrested in the Northern District of Georgia.

11.    During the second interception period in April 2023, through intercepted communications over **TT#3**, physical and electronic surveillance, agents determined that DUNN sent Afiba SMALL-John – a drug transporter - to Newark, New Jersey to obtain 13 to 15 kilograms of cocaine from Khanesavanh NHALAY a/k/a Somsanouk BOUPHAVONG. SMALL was traffic stopped on April 11, 2023 and law enforcement seized 9 kilograms of cocaine and $55,545.00 in cash from his vehicle. Although DUNN was aware of the traffic stop and seizure (as demonstrated by subsequent intercepted communications), he did not cease distributing drugs. Agents believe the cocaine and the money was destined for DUNN.

12.    Additionally, during the same period of interception, BOUPHAVONG and DUNN negotiated a 30 plus kilogram cocaine transaction. Through intercepted calls over **TT#3**, agents learned that DUNN sent Stephen ALLEN – a drug and money transporter - to Columbus, Ohio to meet BOUPHAVONG. Through intercepted calls among DUNN and members of the DTMLO, agents learned that BOUPHAVONG planned to transport cocaine to ALLEN on May 6, 2023, and ALLEN, in turn, would then transport the narcotics to DUNN in Atlanta, Georgia. Through intelligence gathering, a DEA administrative subpoena, intercepted communications over **TT#3**, and physical surveillance by DEA-Newark, agents verified BOUPHAVONG was a guest at Newark-Hilton Hotel on May 5, 2023. On that date, DEA agents encountered BOUPHAVONG in the hotel parking lot and

8

later recovered approximately 29 kilograms of cocaine and $84,893 in bulk cash from BOUPHAVONG's hotel room.

13.    During the last interception period over **TT#3** and **TT#4**, coupled with physical and remote video surveillance, DEA-Atlanta coordinated the arrests of Stephen ALLEN, Dwight DICKERSON, and Tyshaun MOBLEY on June 25, 2023, June 28, 2023, and July 07, 2023 respectively.

14.    Through the wiretap investigation, agents have learned DUNN obtains multiple kilograms of cocaine at a time from MACEDO, Ernest DEAS, and others, and he then supplies various co-conspirators quantities of narcotics – in Georgia, South Carolina, North Carolina, Florida, Alabama, Tennessee, New York, and Ohio. While using multiple phones, Facetime, and encrypted applications, such as WhatsApp, DUNN directed and coordinated multiple individuals, including transporters, stash house coordinators, and drug distributors and sources, who assisted DUNN in the overall drug network. Further as noted above, DUNN had multiple domestic cocaine sources, as well as at least one foreign source

Redacted

Redacted

15.    Prior to DUNN being arrested on July 11, 2023, intercepted communications over both TT#3 and TT#4 suggested DUNN was attempting to procure 200 kilograms of cocaine from the Bahamas, which was destined for the Northern District of Georgia. In fact,

9

SW-123MC1490-000017

throughout the interception periods agents intercepted DEAS over TT#4 over two devices ((313) 978-2582 (the 2582 number), which is associated with **Subject Account 1**, and a device (assigned (313)-948-2753, (the 2753 number) that was disconnected on or about August 21, 2023) and over which DUNN and DEAS were discussing the details of the order.

16.    Following the arrest of DUNN and Afiba SMALL-John on July 11, 2023, both DUNN and SMALL-John provided post-Miranda statements where they each positively identified DEAS as a cocaine supplier. Specifically, DUNN sent SMALL-John to Ft. Lauderdale, Florida in February 2023 to meet DEAS in order to replenish DUNN's cocaine supply. Not only was this incident verified by DUNN and SMALL-John, toll records corroborate this information, and agents intercepted DEAS (using the 2753 number), DUNN, and SMALL-John coordinating the event, coupled with hotel and flight records that agents recently acquired placing DEAS in the Miami, Florida area during the transaction.

17.    Following the dismantlement of the DUNN network, agents have continued the investigation on DEAS. The **2582 phone**, which is associated with **Subject Account 1**, is a device that is actively being used by DEAS, has an active WhatsApp profile assigned to the **2582 phone**, which allows DEAS to communicate with Redacted Agents believe DEAS is utilizing the **2582 phone** to coordinate the importation of cocaine into the United States, to include the Northern District of Georgia.

18.    Also, through information provided by the Department of Homeland Security, agents located a travel itinerary for DEAS, which lists the **2582 phone** as a phone number

10

associated to DEAS on pertinent records. DEAS is a frequent traveler to Nassau, Bahamas and traveled to the Bahamas on separate trips in January, February, and March of 2023. Last, agents have learned DEAS was convicted for a federal drug (cocaine) crime by DEA-South Carolina in 2005 and was sentenced to 20 years for drug trafficking but released early in 2018.

**(i.) June 26, 2023 – DUNN and DEAS Discuss Potential Acquisition of 200 Kilograms of Cocaine**

19.     On June 26, 2023, at approximately 9:42 p.m., DUNN, using TT#4, made an outgoing call to Ernest DEAS, using his alternate phone number (the 2753 number). In pertinent part:

**DUNN**:      "I want to run this to you too. [Inhales] I'ma see what you think about this. So, my friend, S… Uh, who really       wants to do, this is what he want to do. I, I look for a reason to see you anyways to spend time with you. He wants to fly you down here, and, uh, he wants to have a meeting with you. Uh, you met S! Did you? The Asian dude? While you were staying here? Did he come over here?"

**DEAS**:      "I don't know if I met him or not. I don't, I don't, I'm not sure. I don't think so."

**DUNN**:      "Okay."

**DEAS**:      "I saw the guys with the, the, with the, uh, light stuff, the whole light stuff."

**DUNN**:      "Oh, okay. So anyways, let me tell you what I need you to do for me, and if you don't want to I understand. So, you don't have to do nothing with him. I just want you to entertain the conversation with him. This is why. Dude tried to help me and Bill. Same one who you

11

SW-123MC1490-000019

got the one  from. He sent twelve or thirteen and they got hit. Uh, so, he like, 'Man,' Me was the dude I was going to send the extra 200 to [unintelligible], heavy hitter. The same dude I told you about he had a [unintelligible]. So, he called me, he said 'Man why don't you please call Shorty, man, so we can have a meeting.' This is what I told him, first off, I said, 'Bro, having a meeting… I don't know how that is going to make you know, everything, uh, I mean that's not going to expedite the process. Shorty is doing everything he can.' And he was like, 'I want to see when we can do.' This is what he is talking about doing, This is what he is talking about doing. He talking about paying- this, this what I'm getting. He talking about paying you some money, not to go to work, not to do nothing. Flying you to down there, and you just stay down there, and him paying you to stay down there until we get some work. So, I said, 'Man you don't need to do that, you can fly to Detroit if you want to talk to him about that.' So, I said but, I'ma tell you everything I told him. 'First of all, his partner is not gonna want to meet you, and…' Even thought S is solid now, S is solid. "

**DEAS**:        "Uh-huh."

**DUNN:**        "Uh, uh, and I said Shorty is not gonna be able to bridge that gap. The only thing about it is, uh, Shorty can eventually tell him when he do get to that extra 200. Uh, that, uh, this is you know Silk's partner right across the water at Miami 'cause I'm sure he'll be happy about something right next door."

a. Based on the investigation to date, and my knowledge, training, and experience, I believe DUNN contacted DEAS to coordinate a meeting with DEAS and an associate of DUNN's named "S," (Somsanouk BOUPHAVONG), in Atlanta, Georgia ("So, my friend, S… Uh, who really

12

wants to do, this is what he want to do. I, I look for a reason to see you anyways to spend time with you. He wants to fly you down here, and, uh, he wants to have a meeting with you."). DUNN asked if DEAS met "S" in the past, when he was in Atlanta, Georgia ("Uh, you met S! Did you? The Asian dude? While you were staying here?"). DUNN said that he wanted DEAS to consider a sit down with "S" ("I just want you to entertain the conversation with him."). DUNN vouched for "S" by saying that "S" previously provided DEAS one unit of cocaine and also tried to help DUNN and his associate "Bill" with 12-13 units of cocaine, but law enforcement seized the product ("Dude tried to help me and Bill. Same one who you got the one from. He sent twelve or thirteen and they got hit.") DUNN explained that he told "S" that DEAS ("Shorty") was doing what he could, but the meeting may or may not expedite the process to replenish their cocaine supply ("This is what I told him, first off, I said, 'Bro, having a meeting… I don't know how that is going to make you know, everything, uh, I mean that's not going to expedite the process. Shorty is doing everything he can.'"). DUNN said that "S" was willing to fund DEAS's travel to the Bahamas to coordinate another drug load[2] ("He talking about paying you some money, not to go to work, not to do nothing. Flying you to down there, and you just stay down there, and him paying you to stay down there until we get some work."). DUNN said that he explained to "S" that all DEAS could do was confirm when 200 kilograms was available ("The

---

[2] Based upon HSI and Delta flight itinerary, agents are aware that DEAS traveled to Nassau, Bahamas February 15-17, 2023, and returned to Miami, Florida. Through intercepted communication over Target Telephone #4, from February 19-23, 2023, agents determined that DEAS coordinated a 9-kilogram cocaine deal with DUNN, which allowed DUNN to distribute cocaine in the Northern District of Georgia. Therefore, agents believe that DEAS travels to the Bahamas in order to facilitate narcotics transactions.

SW-123MC1490-000021

only thing about it is, uh, Shorty can eventually tell him when he do get to that extra two-hundred."), which may be more favorable to the foreign cocaine source because the Bahamas was closer to Miami, Florida, rather than Atlanta, Georgia ("Uh, that, uh, this is you know Silk's partner right across the water at Miami 'cause I'm sure he'll be happy about something right next door."

20.     On June 26, 2023, at approximately 11:37 p.m., DUNN, using TT#4, made an outgoing call to Ernest DEAS, using his alternate phone (the 2753 number). In pertinent part:

**DUNN:**     "Hey buddy, hey I just found, my, uh, nephew said that he could Zelle something for me. So, uh…"

**DEAS:**     "Okay."

**DUNN:**     "So he- Just Zelle it to this number?"

**DEAS:**     "Uh, you know what Zelle it to the other number. The three, one, three, nine, seven, eight, two, five, eight, two."

**DUNN:**     "Can you text it to me?"

**DEAS:**     "I'ma give you my phone number. Ready?"

**DUNN**:     "He is playing! Yep, yep, I'm ready."

**DEAS:**     "Three, one, three, nine, seven, eight, two, five, eight, two. That's Ernest."

a.   Based on the investigation to date, I know that traffickers often times use multiple cellular phones to conduct their drug transactions to thwart law enforcement. Also, traffickers attempt to insulate personal matters and the hierarchy amongst the organization by using multiple devices. During this call, agents intercepted DUNN and DEAS over TT#4, with DEAS requesting money via Zelle. However, DEAS asked DUNN to send the

14

money to the **2582 phone** to complete the monetary transaction. DUNN told DEAS that he found an associate that could assist in the matter (**"**Hey buddy, hey I just found, my, uh, nephew said that he could Zelle something for me. So, uh…"). DEAS acknowledged ("Okay"). DUNN asked if he should instruct his associate to Zelle the money to the 2753 number ("So he- Just Zelle it to this number?"), but DEAS requested the transaction occur over the **2582 phone** instead ("Uh, you know what Zelle it to the other number."). DEAS recited the **2582 phone** contact number ((313) 978-2582) ("three, one, three, nine, seven, eight, two, five, eight, two."). DUNN asked DEAS to send him a text message containing the phone number ("Can you text it to me?"), but DEAS said he would recite the phone number again (**"**I'ma give you my phone number. Ready?"). DEAS then relayed the contact number for the **2582 phone** for a second time and indicated his name "Ernest" ("Three, one, three, nine, seven, eight, two, five, eight, two. That's Ernest."). Based on the investigation to date, I know that DUNN's primary source of income was the distribution of drugs, particularly cocaine, methamphetamine, and marijuana. Further, I also know that DUNN typically used third parties to send money to drug associates to insulate himself. Here, DUNN said that he would have another individual, "his nephew," send money, which I believe to be drug proceeds, to DEAS, as opposed to DUNN sending the money himself.

**(ii.)    Recent Toll Analysis for the 2582 Phone (associated with Subject Account 1)**

21. Based on recent toll records for the **2582 phone** (both traditional and WhatsApp contacts associated with the **2582 phone**), DEAS is actively using the **2582 phone** to communicate with suspected drug traffickers, including individuals in the Bahamas.

22. Specifically, agents observed tolls that showed that DEAS used the **2582 phone** to communicate with William Lowery a/k/a "Bill" over contact number (404) 927-9649 on 26 occasions from August 2, 2023 through August 30, 2023. During the wiretap

15

investigation, Lowery, using this same 9649 phone number, was intercepted over TT#4 on several occasions in communications about multi-kilogram drug transactions. Based on the intercepted communications and Lowery's criminal history, agents believe Lowery is a poly-drug trafficker who was supplied cocaine and methamphetamine by DUNN, was charged with cocaine trafficking with DEAS in the 2005 DEA South Carolina investigation, and, based on flight records, traveled to the Bahamas with DEAS in March 2023.

23. Additionally, as recently as from August 2, 2023 through September 4, 2023, DEAS has used the **2582 phone** to communicate with multiple telephones with the Bahamas area code, including one number believed to be used by GARDINER on 114 occasions ((242) 455-6984). Based on the prior intercepts and the timing of DEAS's trip to the Bahamas before his cocaine transaction with SMALL, agents believe that at least some of the individuals with Bahamas-based phone numbers are involved in drug trafficking.

24. Based upon these toll records, agents believe DEAS is still using the **2582 phone** to engage in narcotics trafficking.

### (iii.)    Identification of Subject Account 1

25.    On or about September 06, 2023, I received information from Apple, with subscriber information for the iCloud account associated with the **2582 phone** (**Subject Account 1**) Apple provided the Apple ID as Mordeau60@iCloud.com (**Subject Account 1**) and the name of the account holder as Ernest DEAS, with a physical address of 25043 Pierce St., Southfield, Michigan. Notably, DEAS uses this address for hotel, flight, and his driver's license information.

16

SW-123MC1490-000024

## INFORMATION REGARDING APPLE ID AND iCLOUD[3]

26.    Apple is a United States company that produces the iPhone, iPad, and iPod Touch, all of which use the iOS operating system, and desktop and laptop computers based on the Mac OS operating system.

27.    Apple provides a variety of services that can be accessed from Apple devices or, in some cases, other devices via web browsers or mobile and desktop applications ("apps").  As described in further detail below, the services include email, instant messaging, and file storage:

    a.  Apple provides email service to its users through email addresses at the domain names mac.com, me.com, and icloud.com.

    b.  iMessage and FaceTime allow users of Apple devices to communicate in real-time.  iMessage enables users of Apple devices to exchange instant messages ("iMessages") containing text, photos, videos, locations, and contacts, while FaceTime enables those users to conduct video calls.

    c.  iCloud is a file hosting, storage, and sharing service provided by Apple. iCloud can be utilized through numerous iCloud-connected services and

---

[3]    The information in this section is based on information published by Apple on its website, including, but not limited to, the following document and webpages: "U.S. Law Enforcement Legal Process Guidelines," available at http://images.apple.com/privacy/docs/legal-process-guidelines-us.pdf; "Create and start using an Apple ID," available at https://support.apple.com/en-us/HT203993; "iCloud," available at http://www.apple.com/icloud/; "iCloud: iCloud storage and backup overview," available at https://support.apple.com/kb/PH12519; and "iOS Security," available at http://images.apple.com/privacy/docs/iOS_Security_Guide.pdf.

SW-123MC1490-000025

can also be used to store iOS device backups and data associated with third-party apps.

d.  iCloud-connected services allow users to create, store, access, share, and synchronize data on Apple devices or via icloud.com on any Internet-connected device.  For example, iCloud Mail enables a user to access Apple-provided email accounts on multiple Apple devices and on icloud.com.  iCloud Photo Library and My Photo Stream can be used to store and manage images and videos taken from Apple devices, and iCloud Photo Sharing allows the user to share those images and videos with other Apple subscribers.  iCloud Drive can be used to store presentations, spreadsheets, and other documents.  iCloud Tabs enables iCloud to be used to synchronize webpages opened in the Safari web browsers on all of the user's Apple devices.  iWorks Apps, a suite of productivity apps (Pages, Numbers, and Keynote), enables iCloud to be used to create, store, and share documents, spreadsheets, and presentations.  iCloud Keychain enables a user to keep website username and passwords, credit card information, and Wi-Fi network information synchronized across multiple Apple devices.

e.  Game Center, Apple's social gaming network, allows users of Apple devices to play and share games with each other.

f.  Find My iPhone allows owners of Apple devices to remotely identify and track the location of, display a message on, and wipe the contents of those devices.

SW-123MC1490-000026

g. Location Services allows apps and websites to use information from cellular, Wi-Fi, Global Positioning System ("GPS") networks, and Bluetooth, to determine a user's approximate location.

h. App Store and iTunes Store are used to purchase and download digital content. iOS apps can be purchased and downloaded through App Store on iOS devices, or through iTunes Store on desktop and laptop computers running either Microsoft Windows or Mac OS. Additional digital content, including music, movies, and television shows, can be purchased through iTunes Store on iOS devices and on desktop and laptop computers running either Microsoft Windows or Mac OS.

28. Apple services are accessed through the use of an "Apple ID," an account created during the setup of an Apple device or through the iTunes or iCloud services. A single Apple ID can be linked to multiple Apple services and devices, serving as a central authentication and syncing mechanism.

29. An Apple ID takes the form of the full email address submitted by the user to create the account; it can later be changed. Users can submit an Apple-provided email address (often ending in @icloud.com, @me.com, or @mac.com) or an email address associated with a third-party email provider (such as Gmail, Yahoo, or Hotmail). The Apple ID can be used to access most Apple services (including iCloud, iMessage, and FaceTime) only after the user accesses and responds to a "verification email" sent by Apple to that "primary" email address. Additional email addresses ("alternate," "rescue," and "notification" email addresses) can also be associated with an Apple ID by the user.

SW-123MC1490-000027

30.    Apple captures information associated with the creation and use of an Apple ID.  During the creation of an Apple ID, the user must provide basic personal information including the user's full name, physical address, and telephone numbers. The user may also provide means of payment for products offered by Apple.  The subscriber information and password associated with an Apple ID can be changed by the user through the "My Apple ID" and "iForgot" pages on Apple's website.  In addition, Apple captures the date on which the account was created, the length of service, records of log-in times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to and utilize the account, the Internet Protocol address ("IP address") used to register and access the account, and other log files that reflect usage of the account.

31.    Additional information is captured by Apple in connection with the use of an Apple ID to access certain services.  For example, Apple maintains connection logs with IP addresses that reflect a user's sign-on activity for Apple services such as iTunes Store and App Store, iCloud, Game Center, and the My Apple ID and iForgot pages on Apple's website.  Apple also maintains records reflecting a user's app purchases from App Store and iTunes Store, "call invitation logs" for FaceTime calls, and "mail logs" for activity over an Apple-provided email account.  Records relating to the use of the Find My iPhone service, including connection logs and requests to remotely lock or erase a device, are also maintained by Apple.

32.    Apple also maintains information about the devices associated with an Apple ID.  When a user activates or upgrades an iOS device, Apple captures and retains the user's IP address and identifiers such as the Integrated Circuit Card ID number

20

("ICCID"), which is the serial number of the device's SIM card.  Similarly, the telephone number of a user's iPhone is linked to an Apple ID when the user signs in to FaceTime or iMessage.  Apple also may maintain records of other device identifiers, including the Media Access Control address ("MAC address"), the unique device identifier ("UDID"), and the serial number.  In addition, information about a user's computer is captured when iTunes is used on that computer to play content associated with an Apple ID, and information about a user's web browser may be captured when used to access services through icloud.com and apple.com.  Apple also retains records related to communications between users and Apple customer service, including communications regarding a particular Apple device or service, and the repair history for a device.

33.     Apple provides users with five gigabytes of free electronic space on iCloud, and users can purchase additional storage space.  That storage space, located on servers controlled by Apple, may contain data associated with the use of iCloud-connected services, including: email (iCloud Mail); images and videos (iCloud Photo Library, My Photo Stream, and iCloud Photo Sharing); documents, spreadsheets, presentations, and other files (iWorks and iCloud Drive); and web browser settings and Wi-Fi network information (iCloud Tabs and iCloud Keychain).  iCloud can also be used to store iOS device backups, which can contain a user's photos and videos, iMessages, Short Message Service ("SMS") and Multimedia Messaging Service ("MMS") messages, voicemail messages, call history, contacts, calendar events, reminders, notes, app data and settings, and other data.  Records and data associated with third-party apps may also be stored on iCloud; for example, the iOS app for WhatsApp, an instant messaging service, can be configured to regularly back up a user's instant messages on iCloud.

21

SW-123MC1490-000029

34.    In my training and experience, evidence of who was using an Apple ID and from where, and evidence related to criminal activity of the kind described above, may be found in the files and records described above. This evidence may establish the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or, alternatively, to exclude the innocent from further suspicion.

35.    For example, the stored communications and files connected to an Apple ID may provide direct evidence of the offenses under investigation. Based on my training and experience, instant messages, emails, voicemails, photos, videos, and documents are often created and used in furtherance of criminal activity, including to communicate and facilitate the offenses under investigation.

36.    In addition, the user's account activity, logs, stored electronic communications, and other data retained by Apple can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, subscriber information, email and messaging logs, documents, and photos and videos (and the data associated with the foregoing, such as geo-location, date and time) may be evidence of who used or controlled the account at a relevant time. As an example, because every device has unique hardware and software identifiers, and because every device that connects to the Internet must use an IP address, IP address and device identifier information can help to identify which computers or other devices were used to access the account. Such information also allows investigators to understand the

22

SW-123MC1490-000030

geographic and chronological context of access, use, and events relating to the crime under investigation.

37.    Account activity may also provide relevant insight into the account owner's state of mind as it relates to the offenses under investigation.  For example, information on the account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

38.    Other information connected to an Apple ID may lead to the discovery of additional evidence.  For example, the identification of apps downloaded from App Store and iTunes Store may reveal services used in furtherance of the crimes under investigation or services used to communicate with co-conspirators.  In addition, emails, instant messages, Internet activity, documents, and contact and calendar information can lead to the identification of co-conspirators and instrumentalities of the crimes under investigation.  Specifically, messaging apps believed to be utilized by DUNN (iMessage, WhatsApp, Signal, Silent, etc.) may contain record information of communication between co-conspirators in this case.

39.    Therefore, Apple's servers are likely to contain stored electronic communications, digital data, and information concerning subscribers and their use of Apple's services.  In my training and experience, such information may constitute evidence of the crimes under investigation including information that can be used to identify the account's user or users.

23

SW-123MC1490-000031

**INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED**

40.     I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Apple to disclose to the government copies of the records and other information (including the content of communications and stored data) particularly described in Section I of Attachment B.  Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

**CONCLUSION**

41.     Based on the forgoing, I request that the Court issue the proposed search warrant.

42.     This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A).  Specifically, the District Court in the Northern District of Georgia is a district court of the United States that has jurisdiction over the offense being investigated.

43.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

**REQUEST FOR SEALING**

44.     I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court.  These documents discuss wiretap materials which remain sealed and an ongoing

24

criminal investigation that is not known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

25

(Rev. 4/30/2014) Search Warrant

# United States District Court

Northern District of Georgia

In the Matter of the Search of:

**Information associated with the Apple iCloud Account Mordeau60@iCloud.com that is stored at premises owned, maintained, controlled, or operated by Apple Inc., a company headquartered at One Apple Park Way, Cupertino, CA 95014**

**SEARCH WARRANT**

CASE NUMBER: 1:23-mc-1490

**UNDER SEAL**

TO: DEA Special Agent Bruce J. Hernandez and any Authorized Officer of the United States:

An affidavit having been made before me by Special Agent Bruce J. Hernandez, who has reason to believe that, on the property or premises known as

**Information associated with the Apple iCloud Account Mordeau60@iCloud.com that is stored at premises owned, maintained, controlled, or operated by Apple Inc., a company headquartered at One Apple Park Way, Cupertino, CA 95014, as further described in Attachment A**

There is now concealed certain property, certain data, and certain information, namely,

**See Attachment B**

which constitutes evidence of the commission of a criminal offense and property which has been used as the means of committing a criminal offense, concerning violations of 21 U.S.C. §§ 841 and 846, and 18 U.S.C. §§ 1956 and 1957, over which the United States District Court for the Northern District of Georgia has jurisdiction. I find that the affidavit establishes probable cause to search and seize the person or property from the person or premises described above.

YOU ARE HEREBY COMMANDED to execute this warrant on or before September <u>26</u> 2023
Date

(not to exceed 14 days) AT ANY TIME IN THE DAY OR NIGHT AS I FIND GOOD CAUSE HAS BEEN ESTABLISHED. You must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave a copy of the warrant and receipt at the place where the property was taken. The officer executing the warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to United States Magistrate Judge Christopher C. Bly.

September 12, 2023 at     9:19 a.m.                          at     Atlanta, Georgia
Date and Time                                                              City and State

CHRISTOPHER C. BLY
UNITED STATES MAGISTRATE JUDGE
Name and Title of Judicial Officer                              Signature of Judicial Officer
                                                                               Issued pursuant to Federal Rule of Criminal Procedure 4.1.

AUSA John DeGenova / 404-581-6000 /

SW-123MC1490-000034

**RETURN**

| Case No: 1:23-mc-1490 | Date and time warrant executed: | Copy of warrant and inventory left with: |
|---|---|---|

Inventory made in the presence of

A list of property/information/data/person(s) seized:

**CERTIFICATION**

    I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

_____
Date

_____
Executing officer's signature

_____
Printed name and title

SW-123MC1490-000035

## ATTACHMENT A

### Property to Be Searched

This warrant applies to digital information associated with the Apple iCloud Account: **Mordeau60@iCloud.com ("Subject Account 1")** that is stored at premises owned, maintained, controlled, or operated by Apple Inc., a company headquartered at Apple Inc., One Apple Park Way, Cupertino, CA 95014.

1

## ATTACHMENT B

## Particular Things to be Seized

### I.     Information to be disclosed by Apple

To the extent that the information described in Attachment A is within the possession, custody, or control of Apple, including any messages, records, files, logs, or information that have been deleted but are still available to Apple, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Apple is required to disclose the following information to the government, in unencrypted form whenever available, for each account or identifier listed in Attachment A:

1. All records or other information regarding the identification of the account, to include full name, physical address, telephone numbers, email addresses (including primary, alternate, rescue, and notification email addresses, and verification information for each email address), the date on which the account was created, the length of service, the IP address used to register the account, account status, methods of connecting, and means and source of payment (including any credit or bank account numbers);

2. All records or other information regarding the devices associated with, or used in connection with, the account (including all current and past trusted or authorized iOS devices and computers, and any devices used to access Apple services), including serial numbers, Unique Device Identifiers ("UDID"), Advertising Identifiers ("IDFA"), Global Unique Identifiers ("GUID"), Media Access Control ("MAC") addresses, Integrated Circuit Card ID numbers ("ICCID"), Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifiers ("MEID"), Mobile Identification Numbers ("MIN"), Subscriber Identity Modules ("SIM"), Mobile

SW-123MC1490-000037

Subscriber Integrated Services Digital Network Numbers ("MSISDN"), International Mobile Subscriber Identities ("IMSI"), and International Mobile Station Equipment Identities ("IMEI");

3. The contents of all emails associated with the account, including stored or preserved copies of emails sent to and from the account (including all draft emails and deleted emails), the source and destination addresses associated with each email, the date and time at which each email was sent, the size and length of each email, and the true and accurate header information including the actual IP addresses of the sender and the recipient of the emails, and all attachments from November 1, 2022 to September 11, 2023;

4. The contents of all instant messages associated with the account, including stored or preserved copies of instant messages (including iMessages, SMS messages, and MMS messages) sent to and from the account (including all draft and deleted messages), the source and destination account or phone number associated with each instant message, the date and time at which each instant message was sent, the size and length of each instant message, the actual IP addresses of the sender and the recipient of each instant message, and the media, if any, attached to each instant message from November 1, 2022 to September 11, 2023;

5. The contents of all files and other records stored on iCloud, including all iOS device backups, all Apple and third-party app data, all files and other records related to iCloud Mail, iCloud Photo Sharing, My Photo Stream, iCloud Photo Library, iCloud Drive, iWorks (including Pages, Numbers, and Keynote), iCloud Tabs, and iCloud Keychain, and all address books, contact and buddy lists, notes, reminders, calendar

2

SW-123MC1490-000038

entries, images, videos, voicemails, device settings, and bookmarks from November 1, 2022 to September 11, 2023;

6. All activity, connection, and transactional logs for the account (with associated IP addresses including source port numbers), including FaceTime call invitation logs, mail logs, iCloud logs, iTunes Store and App Store logs (including purchases, downloads, and updates of Apple and third-party apps), messaging logs (including iMessage, SMS, and MMS messages), My Apple ID and iForgot logs, sign-on logs for all Apple services, Game Center logs, Find my iPhone logs, logs associated with iOS device activation and upgrades, and logs associated with web-based access of Apple services (including all associated identifiers) from November 1, 2022 to September 11, 2023;

7. All records and information regarding locations where the account was accessed, including all data stored in connection with Location Services from November 1, 2022 to September 11, 2023;

8. All records pertaining to the types of service used; and

9. All records pertaining to communications between Apple and any person regarding the account, including contacts with support services and records of actions taken from November 1, 2022 to September 11, 2023.

3

SW-123MC1490-000039

## II.     Information to be seized by the government

All information described above in Section I that constitutes contraband, fruits, evidence and/or instrumentalities of violations of Title 21, United States Code, Sections 841(a)(1) and 846 (Distribution of Controlled Substances and Conspiracy) and Title 18, United States Code, Sections 1956 and 1957 (Money Laundering and Conspiracy); involving Charles Anthony DUNN, Ernest DEAS, and their co-conspirators, from November 2, 2022 to September 11, 2023, including information pertaining to the following matters:

1. Any and all stored communications, including, voice calls, stored voice mail or other audio messages, text messages, email messages, chats, multimedia messages, and messages through other installed applications, or other electronic communications that evidence the transportation, ordering, distribution, possession and sale of controlled substances, the collection, transmission, or other use of drug proceeds, the laundering of suspected drug proceeds, the possession/use of firearms, and/or the connection to known and as yet unidentified co-conspirators;

2. Photographs, videos, records, other electronic media which show the transportation, ordering, distribution, possession and sale of controlled substances, the collection, transmission, or other use of drug proceeds, the laundering of drug proceeds or the collection, processing, and transmission of cash, the possession, acquisition, or use of firearms, and/or connection to known and as yet unidentified conspirators in the investigation;

4

3. Books, records, receipts, notes, correspondence, ledgers, and other documents and/or papers relating to ownership, residency, or use of any of vehicles and/or properties, including bills, photographs, and personal papers;

4. records of house, warehouse, or apartment leases, safety deposit boxes, or storage facilities;

5. records relating to the purchase of business or personal assets including property, vehicles, furniture, jewelry or any other items or receipts reflecting expenditures for personal or business items;

6. documents reflecting the use of fictitious names, addresses, and business fronts, the use of other people's names addresses and businesses, and the dominion and control over assets placed under someone else's name;

7. The identity of the person(s) who created or used the Apple ID, including records that help reveal the whereabouts of such person(s);

8. Evidence indicating how and when the account was accessed or used, to determine the chronological and geographic context of account access, use and events relating to the crime under investigation and the account subscriber;

9. Any records pertaining to the means and source of payment for services (including any credit card or bank account number or digital money transfer account information);

10. Evidence indicating the subscriber's state of mind as it relates to the crime under investigation;

11. Evidence that may identify any co-conspirators or aiders and abettors, including records that help reveal their whereabouts.

SW-123MC1490-000041

6

This warrant authorizes a review of electronically stored information, communications, other records and information disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the reviewing agency may deliver a complete copy of the disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

6

SW-123MC1490-000042

2705 & Sealing; Rev: 5-19

FILED IN CHAMBERS
U.S.D.C ATLANTA

Date: Sep 12 2023

KEVIN P. WEIMER , Clerk

By: s/James Jarvis

Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| IN RE THE APPLICATION OF THE UNITED STATES OF AMERICA FOR AN ORDER TO PROHIBIT DISCLOSURE OF SEARCH WARRANT AND TO SEAL | CRIMINAL ACTION<br><br>NO. 1:23-mc-1490<br><br>UNDER SEAL |

## UNITED STATES' MOTION TO PROHIBIT DISCLOSURE OF SEARCH WARRANT AND TO SEAL

The United States of America, by Ryan K. Buchanan, United States Attorney for the Northern District of Georgia, and John T. DeGenova, Assistant United States Attorney, requests that the Court prohibit Apple Inc. ("Service Provider") from disclosing the existence of the search warrant in matter number 1:23-mc-1490 until the earlier of: (a) one year, or (b) such time that non-disclosure is no longer required for investigative purposes. The United States also requests that the Court seal the search warrant, this motion, any attachments thereto, and any corresponding order.

In support of its motion, the United States submits as follows:

1. Pursuant to 18 U.S.C. § 2703, the United States will issue the search warrant referenced above, requiring the Service Provider to produce certain records and information to the United States.

2. The Service Provider is a provider of an "electronic communication service," as defined in 18 U.S.C. § 2510(15) and/or is a provider of "remote computing service," as defined in 18 U.S.C. § 2711(2).

3. Under 18 U.S.C. § 2705(b), a federal court has the authority to command a service provider "to whom a warrant, subpoena, or court order is directed, for

SW-123MC1490-000043

such period as the court deems appropriate, not to notify any other person of the existence of the warrant, subpoena, or court order" if the court determines that "notification of the existence of the warrant, subpoena, or court order will result in – (1) endangering the life or physical safety of an individual; (2) flight from prosecution; (3) destruction of or tampering with evidence; (4) intimidation of potential witnesses; or (5) otherwise seriously jeopardizing an investigation or unduly delaying a trial."

4. In this case, the search warrant relates to an ongoing criminal investigation that is neither public nor believed to be known to the target/s of the investigation. Consequently, the United States submits that disclosing the existence of the search warrant could seriously jeopardize the instant investigation by giving the target/s an opportunity to flee or continue flight from prosecution, destroy or tamper with evidence, change patterns of behavior, intimidate potential witnesses and endanger the life or physical safety of an individual. *See* 18 U.S.C. § 2705(b); *ACLU v. Holder*, 673 F.3d 245, 253 (4th Cir. 2011) ("[t]he United States has a compelling interest in protecting the integrity of ongoing … investigations"); *see also Douglas Oil Co. v. Petrol Stops Northwest*, 441 U.S. 211, 218–19 (1979) (describing "interests served by safeguarding the confidentiality of grand jury proceedings").

5. The DEA sought the instant warrant as part of an ongoing narcotics and money laundering investigation. Agents intercepted the suspected user of the Subject Account on a federal wiretap coordinating multiple, multi-kilogram cocaine transactions. Although some individuals have been charged as part of this investigation, the user of the account has not been charged and is not known to be aware of the Government's investigation.   As a result, the United States requests

2

SW-123MC1490-000044

that the Court order the Service Provider not to disclose the existence or content of the search warrant referenced above for a period of up to one year.

6. The United States further requests that the search warrant, this motion (and any attachments thereto), and any corresponding order be sealed until further order of this Court. *See United States v. Gomez*, 323 F.3d 1305, 1307 (11th Cir. 2003) ("district courts have substantial supervisory powers over their records and files").

7. Finally, the United States requests that the Court authorize the Service Provider to disclose the search warrant and any related order to its attorney for the purpose of receiving legal advice.  Further, at any time, the Service Provider may inquire about the status of the investigation by contacting the Assistant United States Attorney listed on the search warrant, or may seek authorization to disclose by filing a motion under seal with this Court and serving a copy of said motion on the listed Assistant United States Attorney.

SW-123MC1490-000045

WHEREFORE, the United States respectfully requests that the Court:

a. Prohibit the disclosure of the search warrant until the earlier of: (a) one year, or (b) such time that non-disclosure is no longer required for investigative purposes; and

b. Seal the search warrant, this motion, any attachments thereto, and any resulting order.

Dated: September 11, 2023.

Respectfully submitted,

RYAN K. BUCHANAN
   *United States Attorney*

JOHN T. DEGENOVA
   *Assistant United States Attorney*
Georgia Bar No. 940689
Email: John.DeGenova@usdoj.gov

600 U.S. Courthouse ▪ 75 Ted Turner Drive SW
Atlanta, GA 30303 ▪ 404-581-6000

4

2705 & Sealing; Rev: 5-19

FILED IN CHAMBERS
U.S.D.C ATLANTA

Date: Sep 12 2023

KEVIN P. WEIMER , Clerk

By: s/James Jarvis

Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| IN RE THE APPLICATION OF THE UNITED STATES OF AMERICA FOR AN ORDER TO PROHIBIT DISCLOSURE OF SEARCH WARRANT AND TO SEAL | CRIMINAL ACTION<br><br>NO. 1:23-mc-1490<br><br>UNDER SEAL |

## NON-DISCLOSURE AND SEALING ORDER

The Government has submitted an application pursuant to 18 U.S.C. § 2705(b), requesting that the Court issue an Order commanding Apple Inc. ("Service Provider"), an electronic communications and/or a remote computing service provider, not to notify any person of the existence of the search warrant in matter number 1:23-mc-1490 until the earlier of: (a) one year, or (b) such time that non-disclosure is no longer required for investigative purposes. The Government also requests that the Court seal the search warrant, this motion, any attachments thereto, and any corresponding Order.

Having read and considered the Government's motion and for good cause shown, the Court finds that there is reason to believe that notification as to the existence of the search warrant associated with the Government's motion will seriously jeopardize an ongoing investigation, potentially by giving the target/s an opportunity to: (a) flee or continue flight from prosecution, (b) destroy or tamper with evidence, (c) change patterns of behavior, and (d) notify confederates. *See* 18 U.S.C. § 2705(b).

For the same reasons, the Court finds that good cause exists to seal the search warrant, the Government's motion (and any attachments thereto), and this Order.

SW-123MC1490-000047

THEREFORE IT IS HEREBY ORDERED, under 18 U.S.C. § 2705(b), that the Service Provider shall not disclose the existence of the search warrant or this Order, to any person until the earlier of: (a) **ONE YEAR FROM THE DATE OF THIS ORDER**, unless such date is extended by the Court for good cause, or (b) being advised, pursuant to an inquiry to the Assistant United States Attorney listed on the search warrant, that non-disclosure is no longer required for investigative purposes.

IT IS FURTHER ORDERED that the Service Provider may disclose the search warrant to its attorney for the purpose of receiving legal advice. Furthermore, at any time, the Service Provider may inquire about the status of the investigation by contacting the Assistant United States Attorney listed on the search warrant, or may seek authorization to disclose by filing a motion under seal with this Court and serving a copy of said motion on the listed Assistant United States Attorney.

SW-123MC1490-000048

IT IS FURTHER ORDERED that the search warrant, the Government's motion and any attachments thereto, and this Order, be sealed until further order of the Court.

SO ORDERED, September 12th , 2023.

_____
CHRISTOPHER C. BLY
UNITED STATES MAGISTRATE JUDGE

Presented by:
John T. DeGenova
Assistant United States Attorney

3

SW-123MC1490-000049